THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CURTIS L. HENRY (Impleaded), Defendant-Appellant.

(No. 56400;

First District (2nd Division)—December 11, 1973.

James J. Doherty, Public Defender, of Chicago (Michael Weininger, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (John C. O'Rourke, Jr., Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

At approximately 6:00 A.M. on 15 March 1970, Randy Steger, a Clark Oil Station attendant, was found mortally wounded on the floor of a utility room in a house near the station. The station was located on the southwest corner of Route 83 and Ridgeland Avenue in Palos Heights, Illinois. Steger was taken to a hospital where he died from multiple bullet wounds. Indictment No. 70-1332 charged Curtis Henry and Clifford Cheers with the murder of Steger and with attempt armed robbery. Cheers was granted a severance and testified against Henry. Henry was found guilty of both offenses in a bench trial and was sentenced to no less than 50 nor more than 100 years for murder to run concurrently with a term of not less than 5 nor more than 14 years for the attempt armed robbery. The charges against Cheers were subsequently withdrawn.

Officer Michael Smith of the Worth police department testified that he received a communication to proceed to the Clark Station from his position at 118th Street and Harlem. He arrived at the station at approximately 6:15 A.M. Upon arriving at the station, he noticed some footsteps made by square-toed shoes in the snow that had recently fallen. He followed the footsteps from the front door of the station along a station driveway in a northerly direction to Route 83 and then west on Route 83 on the south shoulder of the road. After about three-quarters of a block, the footsteps crossed Route 83 and proceeded north into premises of the Sanitary District. At this juncture, the witness was joined by a Chicago Ridge squad car. The witness requested the officers in the squad car to stay where the footsteps turned north. The witness then proceeded east on Route 83, intending to return to Ridgeland, turn

north, and enter an access road running west from Ridgeland into the same premises of the Sanitary District.

As he was proceeding eastbound on Route 83, the witness observed a man come out of the access road onto Ridgeland Avenue. This man was the defendant, Curtis Henry. His clothing matched the description the witness had been given over the radio. That description was of a black leather jacket, gray pants with stripes and bell bottoms. The witness continued to observe defendant as defendant walked south on Ridgeland, crossed Route 83, and then proceeded east on the south side of Route 83. When the witness stopped defendant, he was between 100 and 200 feet east of Ridgeland.

After stopping defendant, the witness noticed that defendant was wearing square-toed shoes. Defendant was placed under arrest and advised of his constitutional rights. Defendant kept telling the officer that he had done nothing wrong and was only returning home from a party.

Having made the arrest, the witness and another police officer retraced defendant's footsteps north on Ridgeland for about 100 feet where they turned into the premises of the Sanitary District. The footsteps eventually led to the front door of the Clark Station. It took 15 minutes to retrace the steps. The arrest of defendant had been made within 20 minutes of the time the officer had arrived at the station.

Michael Rowley, an off-duty attendant at the gas station, lived about 100 feet from the station in the house of his parents in which the victim was found. He testified he saw Steger lying on the floor in the utility room a little after 6:00 A.M. The witness further testified that he saw footprints of one person in the snow, leading away from the gas station.

A Chicago Police Department Crime Detection Lab technician, Timothy Zamb, testified that he received and examined the clothing worn by both the deceased and the defendant. The witness found numerous perforations in the deceased's clothing and the clothing was bloodstained. The witness did not, however, find any bloodstains or powder residue on defendant's clothing.

The witness testified that an examination of defendant's sweater disclosed that the second and third buttons from the top and right front panel area were missing. In addition, two buttons in the right front panel waistband area were found to be missing. The witness was then shown a gray button that had been found in Cheer's automobile. He testified that the button was morphologically similar to the remaining buttons on the right front panel of the garment. (A second button also found in Cheer's automobile could not be matched).

The witness further testified that an examination of defendant's trousers

disclosed tears on the left knee area and in the right buttocks area. There were rips in and around the front and rear right pocket areas. The witness was then shown an envelope containing threads recovered from a telephone pole in front of the station. The threads were found on the east side of the pole about waist high. The witness testified that the threads were morphologically identical with the fibers in defendant's gray and white trousers.

A pathologist testified that the cause of death was a bullet wound to the abdomen and a laceration of the liver. He also noted that there were seven entrance wounds and five exit wounds. A firearms expert testified that the bullets that had killed the deceased were fired from the nine-shot, .32 caliber Vilar semi-automatic pistol identified as belonging to Cheers and found under a rock 500 feet west of the gas station on Route 83, 5′ 10″ from the south side of the road.

It further developed that Henry and Cheers had been taken to the hospital where Steger had been taken for treatment before his death. Steger did not make an identification of defendant or of Cheers before he died.

Clifford Cheers, the severed codefendant, testified he was at his house at 14734 Oakley with Curtis Henry, the witness' mother, the witness' wife, Henry's girl friend Janice Spears, and a lady named Willabee until about 5:00 A.M. on 15 March 1970, when the women expressed a desire to leave. Cheers accompanied defendant into the bedroom where defendant asked to see Cheers' gun and defendant stated that he knew of a place where they could get some money. Cheers put the gun in his pocket, and everyone (except Cheers' wife) got into Cheers' automobile.

They dropped Cheers' mother off at her house at 155th and Lincoln and proceeded to the vicinity of 147th and Winchester where defendant went into his mother's house and where Spears and Willabee were dropped off to stay at the mother's house. While defendant was in the house, Cheers took one shell out of the gun and put it on the seat of the car and placed the gun on safety. Defendant returned and directed him to the gas station. Driving west on Route 83, they went past the station slowly and stopped about two blocks west of the station. There they discussed the robbery. Defendant got out of the car with the gun after having removed another shell. The witness then drove back east on Route 83 past defendant to the end of Howell Airport. He was to return to the location west of the station on Route 83. Defendant was proceeding on foot east toward the station. The time was now a little before 6:00 A.M.

The witness drove to the airport and back, but defendant was not at the meeting place. The witness continued to drive around until he was

stopped by a policeman for going the wrong way on a one-way street. After a short conversation with the officer, the witness went on his way. He was on his way to 147th Street when he was arrested. The police took two .32 caliber bullets from the seat of his car.

At 9:30 A.M. on Monday the 16th in a courtroom bullpen, the witness asked defendant whether he had shot the deceased. Defendant replied that he had. Later that evening in the lockup at the County Jail, defendant again admitted to the witness that he had shot the deceased. When asked why, he replied that the victim was a big dude and defendant was scared of him. In describing the shooting, defendant allegedly told the witness that, when defendant went into the gas station, the attendant asked whether he had run out of gas. Defendant replied that he had. The attendant remarked that it was cold outside and left defendant for a moment. When he returned, defendant pulled a gun on him. The attendant ran out the front door, and defendant shot at him. The attendant fell, and defendant went over to pick him up and grabbed his arm to bring him back inside the station. The attendant pulled away from him, and defendant shot him again. On Tuesday, the 17th, defendant again described the shooting and stated that he had hidden the gun under a rock. These conversations were repeated on several occasions.

On cross-examination, the witness denied knowledge of any deal in exchange for his testimony.

Defendant testified that he, his wife, and baby arrived at his grandmother's house at 110th and Throop about 9:00 or 9:30 P.M. on the 14th. He called his mother to pick him up, which she did. She took him to her house in Harvey. He left the house alone about two hours later. He then went to the Sparrow's Lounge at 147th and Page in Harvey, arriving there about midnight or 12:30 A.M. of the 15th. After walking in and out, he went two doors down to the Embassy Lounge. There he met an individual named Charles. He left the lounge with Charles between 1:30 and 2:00 A.M. They were joined by two girls by the names of Joyce and Dolores.

The group purchased some whiskey and beer and were driving around. After an argument, Charles put defendant out of the car on Route 83. It was almost daylight by this time. About an hour later, he was arrested.

Defendant denied seeing Cheers that evening; denied having an opportunity to talk to Cheers about the case; denied telling Cheers he shot Steger; and denied that he knew that Cheers had a gun.

On cross-examination, defendant testified that he did not see Janice Spears or Cheers' wife on 15 March. He further testified that, after he had been put out of the car, he walked east on Route 83 until he passed the Clark Station. He stated he did not go into the gas station or ever

walk off Route 83. He explained the tear in his pants as having occurred as the result of wrestling with his brother about 6 months prior to the incident. Finally, he denied seeing Cheers' car drive by him on Route 83. Neither did he see anybody else walking east on Route 83.

OPINION

Defendant raises only two issues on this appeal. The first issue is whether defendant was proved guilty beyond a reasonable doubt. Specifically, defendant complains that his conviction was based upon the uncorroborated testimony of an accomplice who had his immediate release as a motive to lie. Defendant contends that this fact, coupled with the lack of any traces of blood or powder residue on his clothing and with the deceased's failure to identify him, raises a reasonable doubt of defendant's guilt. We do not agree.

■■ Even the uncorroborated testimony of an accomplice, if it satisfies the court or jury beyond a reasonable doubt, is sufficient to sustain the conviction of a felony. (*People v. Piehl* (1972), 6 Ill.App.3d 296, 285 N.E.2d 612; *People v. Hansen* (1963), 28 Ill.2d 322, 192 N.E.2d 359.) However, here physical evidence adduced at trial corroborates the accomplice's testimony in that it clearly places defendant at the scene of the crime. The threads on the utility pole were identical to the threads in defendant's trousers, and defendant did not account for their presence on the pole. Defendant was arrested only a short time after the incident, only a short distance from the scene, and his footprints, when retraced, led back to the gas station.

■■ Furthermore, the credibility of the witnesses was a matter for the determination of the trier of fact, and his judgment should not be disturbed unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. (*People v. Raddle* (1963), 39 Ill.App.2d 265, 188 N.E.2d 101; *People v. Mann* (1973), 15 Ill.App.3d 912.) In the light of the physical evidence and the testimony of Officer Michael Smith as to the footprints, we cannot say that the accomplice's story was so unsatisfactory or improbable as to raise a reasonable doubt.

■■ Lastly, defendant contends that the sentence imposed for murder is excessive. At the hearing in aggravation and mitigation, it was established that defendant was married and the father of two children. He had no prior criminal record. He had served in the Armed Forces in Vietnam, had been wounded twice, and had received an honorable discharge. Nothwithstanding the foregoing mitigating facts, the authority given to reviewing courts to reduce sentences imposed by trial judges should be applied with considerable caution and circumspection, "for the trial judge ordinarily has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound

determination concerning the punishment to be imposed than do the appellate tribunals." (*People v. Taylor* (1965), 33 Ill.2d 417, 211 N.E.2d 673; *People v. Caldwell* (1968), 39 Ill.2d 346, 236 N.E.2d 706.) Given the violent nature of this crime (seven bullet entrance wounds, which, according to Cheers' testimony, would have emptied the gun), we cannot say that the sentence imposed is disproportionate to the crime committed.

Judgment affirmed.

STAMOS, P. J., and LEIGHTON, J., concur.