THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES WARNER, Defendant-Appellant.

First District (4th Division)   No. 84—1637

Opinion filed June 26, 1986.—Rehearing denied August 19, 1986.

Steven Clark and Karen Michaels, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Inge Fryklund, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant, Charles Warner, was convicted of murder and sentenced to 200 to 500 years' imprisonment. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a)(1), 1005—8—1(b)(1), 1005—8—1(c)(1).) On appeal, defendant argues that the trial court committed reversible error in its denial of defendant's motion to suppress an oral inculpatory statement he made to Chicago authorities during custodial interrogation. Defendant claims that his waiver of counsel during questioning initiated in Chicago by Chicago authorities was invalid as a matter of law because it violated his right to remain silent and to speak to an attorney. Defendant's claim is based on the ground that he had requested counsel during prior custodial interrogation in Florida by agents of the Federal Bureau of Investigation (FBI). Defendant's return to Illinois from Florida resulted from his voluntary, consensual waiver of his right to an extradition hearing in Florida following consultation with counsel in Florida. Defendant also contends that the trial court's sentence amounted to an abuse of discretion.

For the reasons set forth more fully below, we conclude that the defendant's waiver of his right to counsel in Chicago was not involuntary *per se*; that his interrogation by Chicago authorities did not violate his right to counsel; that any assumed error in the admission of the inculpatory statement made by defendant during his interrogation in Chicago was harmless; and that the trial court's sentence did not constitute an abuse of discretion.

BACKGROUND

Defendant was prosecuted for the July 1977 murder of Christanna White in Chicago. White's body was found in defendant's apartment in the city of Chicago when an officer of the Chicago police department investigated the apartment because of odors that were emanating from the residence. Defendant did not dispute at trial that he had killed White. Instead he argued that his conduct

amounted either to self-defense or voluntary manslaughter.

Evidence produced at trial established that on the evening of July 8, 1977, defendant and White were seen together at a cocktail lounge located across the street from defendant's apartment. Defendant and White were served quite a bit of liquor and, after three hours, left the lounge together.

White's body was subsequently discovered in defendant's apartment on July 11 by an officer of the Chicago police department. She was unclothed, lying face up on a mattress, and was surrounded by considerable blood. Eleven stab wounds had been inflicted to her chest and abdominal regions. Her body had been mutilated and dismembered. There was no visible sign of a struggle in the apartment. After the officers removed her body from the apartment, they found a knife under the mattress on which White's body was lying. The knife found under the mattress had been given to defendant by his employer for use in the performance of his janitorial duties, and was usually stored on a shelf in the employer's shipping and receiving department.

On the morning of July 15, 1977, defendant visited his place of employment to obtain his pay check and return a loan which he had received from his immediate supervisor, Wyatt Akin. During a brief conversation, Akin pointed to a newspaper article which reported White's death and asked defendant if he had done "this," to which defendant replied, "Yes, I did." When Akin expressed disbelief, defendant told Akins that he and White had both been drunk, that she was to engage in sexual acts with defendant for money, and after a disagreement, she tried to take some money from him and had threatened to kill him if he did not comply with her demand for more money than originally agreed. Defendant stated that he had taken a knife away from her and killed her. Defendant agreed with Akin that he should surrender himself to the police. After defendant left the premises, Akin noticed that the knife which had been used by the defendant in connection with his janitorial duties was missing.

Defendant did not surrender to police, but instead went to Miami, Florida, where he obtained employment. He was subsequently located there in 1982 by officers of the Chicago police department, who notified the FBI that defendant was in Miami and informed the Miami police department of the existence of a Chicago warrant for defendant's arrest in connection with the White homicide.

On July 14, 1982, special agents of the Miami office of the FBI arrested defendant at his place of employment in Miami, where he had been working for four years. Defendant was advised of his

*Miranda* rights and taken to the FBI's Miami office for processing. Defendant then told the agents "that he wished to speak to a lawyer prior to answering any questions" and the agents immediately refrained from asking any questions. No formal interview of defendant was ever conducted by the FBI agents. Defendant was turned over to the Florida authorities, who detained him in a Florida prison. The FBI agents did not notify the Chicago police department of defendant's arrest. One of the agents did prepare a 302 report (an interview form used by the FBI to summarize its contact with individuals) which he sent to the Chicago office of the FBI, but did not disseminate this report, the contents of which are not of record, to any other individual or agency.

Subsequent events which transpired in Miami following defendant's arrest by the FBI in July 1982 and preceding his return to Chicago in October 1982 are not set forth in the record in detail. The record does disclose, however, according to defendant's motion to suppress his confession, "[t]hat he was arrested in Florida on the warrant issued in the within cause and thereafter, after appointment of counsel, waived extradition."

On October 22, 1982, Detectives Liberty and Jonda of the Chicago police department flew to Miami to return the defendant to Illinois. At the Dade County Correctional Facility in Miami, the Chicago officers received transmittal papers from jail officials. These documents did not include any report prepared by the FBI. Defendant was handcuffed and given his *Miranda* rights. He did not indicate that he wished to consult with an attorney. The trial court found, following the suppression hearing, that no interrogation of defendant occurred during the flight from Miami to Chicago. This factual determination is not disputed by defendant in this appeal.

After the flight from Miami to Chicago, defendant was transported to a police station where he was placed in an interrogation room. That evening, Barry Pechter, an assistant State's Attorney of Cook County, came to the room to speak with defendant. Pechter was aware that defendant had been brought back from Florida, but did not know which agency had effectuated the arrest and had not spoken to the FBI or any Florida authorities before speaking to defendant. In the presence of Chicago police officers, Pechter introduced himself to defendant and advised him that although he was an attorney, he was not defendant's attorney, but rather was an assistant State's Attorney working with the police in their investigation of the stabbing of White. Pechter advised defendant of his *Miranda* rights. After each right was communicated, defendant acknowledged

that he understood the right. Defendant then agreed to speak with Pechter.

Defendant told Pechter that he and White had returned to his apartment after meeting at a cocktail lounge. After drinking liquor in his apartment, White agree to have sexual relations with defendant in exchange for defendant's paying her $30. Subsequently White demanded more money; when defendant refused, White picked up a $20 bill that was on a coffee table and inserted it into her body. She refused to return the money, threatening him with "gang violence." Defendant became angry, took a knife on the coffee table, and stabbed White once in the chest. Thinking White was dead, defendant used the knife to cut and dismember her body in order to recover the money she had taken. He then left the apartment.

Defendant's motion to suppress his inculpatory statement to Chicago authorities argued that his interrogation by Chicago officials violated his fifth amendment right to counsel which he had invoked when questioned by the FBI in Miami in July 1982. He also contended in the alternative that he did not voluntarily waive his right to remain silent and to speak with an attorney when he was interrogated by Chicago authorities in October 1982. The defendant does not dispute on appeal the trial court's factual finding that his waiver of his *Miranda* rights in Chicago pursuant to questioning here was knowingly, intelligently, and voluntarily made; as a result, we need not state in detail the evidence presented to the trial court with regard to this aspect of the defendant's motion to suppress his inculpatory statement.

In denying defendant's motion to suppress his statement on the ground that interrogation in Chicago violated the fifth amendment right to counsel which defendant had invoked during FBI interrogation of him in Miami, the trial court noted that defendant had not invoked his right to counsel in the presence of the Chicago officers who escorted him back to Chicago. The court also found no evidence that the Miami FBI had advised any other agency of defendant's request for counsel. The court considered it unreasonable to impute knowledge of defendant's request for counsel from the FBI to the Chicago authorities, in view of the 90-day interim between defendant's request for counsel in Miami and his interrogation in Chicago, the distance between cities, and the different jurisdictions involved.

The jury returned a verdict finding the defendant guilty of murder. After a hearing in aggravation and mitigation, the trial court found that the killing was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty and sentenced defend-

ant to serve 200 to 500 years' imprisonment in the Illinois Department of Corrections. Defendant's timely appeal followed.

OPINION

I

Defendant asserts that the oral inculpatory statement he made during custodial interrogation by an attorney of the Cook County State's Attorney's office in Chicago on October 22, 1982, was procured in violation of his right to be free from self-incrimination under the fifth and fourteenth amendments to the United States Constitution. (U.S. Const., amends. VI, XIV.)[1] Defendant argues that he invoked his fifth amendment rights to remain silent and to speak to an attorney when questioned by the FBI in Miami, Florida, in July 1982, and that the Chicago authorities could not, except in violation of his fifth amendment rights, thereafter interrogate him on their own initiative in October 1982 following his voluntary return to Illinois.

The fifth amendment to the United States Constitution states in pertinent part that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) An accused who is the subject of custodial interrogation is entitled to admonition of his fifth amendment right prior to the commencement of any questioning, *i.e.*, he must be advised of his right to remain silent and to consult with an attorney, and of the consequences of his waiver of those rights. *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

■ Once a suspect has invoked his right to remain silent during police interrogation, his subsequent waiver of this right upon police-initiated reinterrogation will be deemed nonetheless legally valid if the waiver is knowing, intelligent, and voluntary. (*Michigan v. Mosley*

---

[1]Defendant does not claim that the interrogation occurred in derogation of his right to counsel under the sixth amendment to the United States Constitution. (U.S. Const., amend. VI.) In fact, during oral argument before this court, defendant's attorney was questioned from the bench whether defendant was relying upon his fifth amendment right to counsel under *Miranda*, or his sixth amendment right to counsel, or both. Counsel for defendant replied that he was relying solely upon his fifth amendment right to counsel. As a result, we do not address the question of whether defendant's interrogation by Chicago authorities violated defendant's sixth amendment right to counsel, nor whether that right had attached at the time he was questioned by the FBI in July 1982 or the Chicago authorities in October 1982. *Cf. People v. Fleming* (1985), 134 Ill. App. 3d 562, 480 N.E.2d 1221, *appeal denied* (1985), 108 Ill. 2d 575.

(1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321.) However, where an accused has invoked his right to an attorney during police questioning, rather than solely his right to remain silent, his later waiver of the right to counsel upon police-initiated reinterrogation will not be given legal cognizance; instead it will be deemed involuntary as a matter of law. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) The *per se* involuntary waiver of the right to counsel rule adopted in *Edwards* is thus an exception to the standard generally applied to waivers, *viz,* "whether, as an individual, case-by-case matter, a waiver of the right to counsel had been knowing, voluntary, and intelligent. [Citation.]" *Solem v. Stumes* (1984), 465 U.S. 638, 647, 79 L. Ed. 2d 579, 589, 104 S. Ct. 1338, 1343; see also 465 U.S. 638, 647-48 n.7, 79 L. Ed. 2d 579, 590 n.7, 104 S. Ct. 1338, 1351 n.7; *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830; *Miranda v. Arizona* (1966), 384 U.S. 436, 474-75, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.

Defendant asserts that because he invoked his right to counsel during FBI questioning in Miami in July 1982, he could not be the subject of police-initiated interrogation by Chicago authorities in October 1982. He argues that the FBI's knowledge of his assertion of his right to counsel should be attributed to Chicago authorities. In reliance upon *Edwards,* he further contends that his waiver of his right to counsel during Chicago interrogation was involuntary as a matter of law, and that as a result the ensuing inculpatory remark he gave to Chicago authorities should not have been admitted at trial.

The record does not disclose whether the FBI attempted to question the defendant regarding his extradition to Illinois, his involvement in the White homicide, or both. The arguments of the defendant and the State on appeal assume that this absence of any clear evidence on the scope of FBI questioning is relevant to a disposition of the defendant's arguments herein. We question the premise of the parties' contentions on this point, however, as it would appear that a defendant has no fifth amendment right to remain silent pertaining to extradition interrogation, because extradition is not a criminal proceeding *per se.* (See *United States ex rel. Vitiello v. Flood* (2d Cir. 1967), 374 F.2d 554; *Cobb v. Gilman* (1979), 271 Ind. 223, 391 N.E.2d 618; *Reeves v. Cox* (1978), 118 N.H. 271, 385 A.2d 847; see generally *e.g., Michigan v. Doran* (1978), 439 U.S. 282, 58 L. Ed. 2d 521, 99 S. Ct. 530; *State v. Falcon* (1985), 196 Conn. 557, 494 A.2d 1190; *Utt v. State* (1982), 293 Md. 271, 443 A.2d 582.) We therefore will assume, for the purpose of analysis, that the FBI attempted to interrogate the defendant regarding the White homicide.

We note at the outset that *Edwards* is factually distinguishable from the case at bar. In *Edwards,* the accused asserted his right to counsel during interrogation by officers of a particular police unit. He was returned to detention in that jurisdiction and interrogation was terminated. Later, officers of the same police unit that had earlier questioned the suspect returned and initiated further interrogation. The defendant waived his right to counsel and made an inculpatory statement. The Supreme Court held that the accused's waiver of his right to counsel was invalid because police initiation of subsequent interrogation violated the defendant's right to an attorney. *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.

*Edwards* recognized that a suspect's request for counsel represents the accused's expression that he views the questioning as overwhelming and coercive, that he does not feel himself capable of dealing with the police at arm's length on his own, and that he desires the advice of counsel. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85; see also *Miranda v. Arizona* (1966), 384 U.S. 436, 465-66, 16 L. Ed. 2d 694, 718-19, 86 S. Ct. 1602, 1623.) Thus subsequent decisions have also applied the *Edwards* rule to factual circumstances similar to those presented in *Edwards, viz,* where the second police interrogation without the benefit of counsel requested by the accused is, in its impact upon the suspect, nothing more than an extension of the original questioning and forms a single, continuous period of coercive interrogation. See, *e.g., Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (per curiam); *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830; *Wyrick v. Fields* (1982), 459 U.S. 42, 74 L. Ed. 2d 214, 103 S. Ct. 394 (per curiam); see also *United States v. Downing* (1st Cir. 1981), 665 F.2d 404; *United States v. Scalf* (10th Cir. 1983), 708 F.2d 1540; *United States ex rel. Karr v. Wolff* (N.D. Ill. 1983), 556 F. Supp. 760, *vacated & remanded in light of Solem v. Stumes* (7th Cir. 1984), 732 F.2d 615.

In the case at bar, in contrast, the defendant asserted and was provided counsel pursuant to FBI questioning in Florida. The record is devoid of any indication, and defendant does not contend, that he was questioned by anyone at any time in Florida following his request for counsel, in violation of *Edwards.* Furthermore, for the reasons stated more fully below with respect to whether knowledge of the defendant's request for counsel should be imputed to the Chicago authorities, the facts of this case do not present circumstances that can be said to amount to a single, continuous period of coercive custodial interrogation in the mind of an accused.

Defendant argues instead that the FBI's knowledge of his assertion of his fifth amendment right to counsel should be attributed to Chicago authorities who questioned him in Illinois following his voluntary, consensual return to Illinois three months later. He claims that if the FBI's knowledge of his invocation of the right to counsel is imputed to the Chicago authorities, then his questioning in Illinois violated *Edwards,* and his waiver of his right to counsel in Chicago was involuntary as a matter of law. It follows from defendant's argument that if knowledge is not imputed from the FBI to Chicago authorities, then his questioning in Illinois did not contravene *Edwards,* and his waiver was valid if it was knowing, intelligent, and voluntary under the totality of the circumstances. Thus, defendant's argument raises the question of whether the validity of his waiver should be determined on the basis of the *per se* standard of *Edwards,,* or the totality of the circumstances rule generally applied to waivers of a fifth amendment right during custodial interrogation. Resolution of this question depends upon a determination of which of these standards would best serve the purposes of the fifth amendment protections enunciated in *Miranda v. Arizona.*

The procedural safeguards adopted in *Miranda* are designed to ensure that questioning of an accused by police authorities does not degenerate from careful investigation to overzealous inquisition in an "atmosphere [that] carries its own badge of intimidation \*\*\* [that is] destructive of human dignity \*\*\* [and] is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself." (*Miranda v. Arizona* (1966), 384 U.S. 436, 457-58, 16 L. Ed. 2d 694, 714, 86 S. Ct. 1602, 1619.) By requiring the admonition of *Miranda* warnings prior to the onset of custodial interrogation, courts are provided an objectively verifiable means to determine if an accused's statement to authorities is the product of his own free will and not caused by the overbearing compulsion created by his isolation in police custody. 384 U.S. 436, 467, 16 L. Ed. 2d 694, 719, 86 S. Ct. 1602, 1624; see *Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 420, 106 S. Ct. 1135, 1140-41; *Minnesota v. Murphy* (1984), 465 U.S. 420, 430, 79 L. Ed. 2d 409, 421, 104 S. Ct. 1136, 1143-44.

The imputation of police knowledge of an accused's assertion of his fifth amendment right to counsel is also designed to achieve a related objective. This goal is to prevent an accused's request for counsel during interrogation from being nullified by police authorities "by the expedient of transferring his custody for questioning to an officer who would be unaware of the request for an attorney" (*People v.*

*White* (1975), 61 Ill. 2d 288, 294, 335 N.E.2d 457, 461, *cert. denied* (1976), 424 U.S. 970, 47 L. Ed. 2d 738, 96 S. Ct. 1469), and to prevent "an attempt by police to avoid responsibility by dividing it among different individuals" (*People v. Gabbard* (1979), 78 Ill. 2d 88, 98, 398 N.E.2d 574, 579). See also *People v. Medina* (1978), 71 Ill. 2d 254, 261, 375 N.E.2d 78; *People v. Blanchard* (1967), 37 Ill. 2d 69, 73, 224 N.E.2d 813; *People v. Stone* (1978), 61 Ill. App. 3d 654, 658, 378 N.E.2d 263; *cf. Michigan v. Jackson* (1986), 475 U.S. ___, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (sixth amendment).

Fifth amendment jurisprudence regarding a suspect's rights during custodial interrogation is not intended, however, to establish a *per se* rule that an attorney be present during all custodial interrogation, nor is it designed to transform police authorities into an accused's "preliminary attorney" until counsel is in fact requested by the accused during the course of questioning (See *Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 421-24, 106 S. Ct. 1135, 1142-45.) Instead, its purpose is to strike a balance between an accused's right to be free from coercive custodial interrogation which undermines his ability to make independent decisions, and society's right to effective police investigation and law enforcement. (475 U.S. ___, ___, 89 L. Ed. 2d 410, 424-25, 106 S. Ct. 1135, 1144; *cf. Maine v. Moulton* (1985), 474 U.S. ___, ___, 88 L. Ed. 2d 481, 497-98, 106 S. Ct. 477, 488-89 (sixth amendment).) It achieves this balance between the accused's rights and those of the community at large by according to "the *defendant* the power to exert some control over the course of interrogation" (emphasis in original) (*Moran v. Burbine* (1986), 475 U.S. ___, ___, 89 L. Ed. 2d 410, 424, 106 S. Ct. 1135, 1144) by exercising his right to remain silent and to speak with counsel.

In our view the danger of coercive or compulsive interrogation does not arise in a factual setting such as the one at bar. The record here demonstrates that the defendant was taken into custody by the FBI, given his *Miranda* rights, and requested assistance of counsel. He was not questioned thereafter by any police authority while in Florida awaiting his possible extradition to Illinois. Following his consultation with an attorney, defendant waived his right to formal extradition proceedings and consented voluntarily to his return to Illinois. There is nothing in the record to suggest, nor does defendant argue, that there was any impropriety whatsoever in his treatment in Florida. Upon his voluntary return to Illinois three months later, defendant was advised by authorities of his *Miranda* rights, knowingly and voluntarily waived those rights, and made an oral inculpatory statement.

■ In light of these circumstances, we are unable to conclude that the FBI's knowledge of defendant's assertion of his right to counsel should be attributed to the Chicago authorities when defendant was questioned in Chicago three months later. There is nothing in the record to demonstrate that the FBI or the Chicago authorities engaged in a course of conduct, either intentional or unintentional, which would have the effect of shifting a defendant's custody and interrogation from one unit to another so that the authorities could avoid the responsibility of respecting an accused's request for counsel, and in essence thereby force the suspect to confess to his involvement in criminal activity. (*Cf. People v. Bates* (1985), 133 Ill. App. 3d 205, 478 N.E.2d 1106, *appeal denied* (1985), 108 Ill. 2d 574.) Nor indeed can we conclude that the mere attempt by Chicago officials upon a defendant's return to Chicago to determine whether the suspect wished to speak to an attorney rather than to be interrogated by the authorities regarding his part in a criminal offense would amount to a coercively charged atmosphere which would threaten to destroy a defendant's sense of free will such that he would feel compelled to speak out and incriminate himself rather than to remain silent. *Cf. People v. Fleming* (1985), 134 Ill. App. 3d 562, 480 N.E.2d 1221, *appeal denied* (1985), 108 Ill. 2d 575.

Consequently, we are unable to conclude that the facts of this case present circumstances wherein "the authorities through 'badger[ing]' or 'overreaching'—implicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v. Illinois* (1984), 469 U.S. 91, 98, 83 L. Ed. 2d 488, 495-96, 105 S. Ct. 490, 494-95 (per curiam).

We find it noteworthy that the United States Supreme Court does not automatically and in all circumstances impute police refusal to honor a suspect's fifth amendment rights from one interrogating authority to another. Even where the first interrogation occurred without the giving of any *Miranda* rights to an accused, the Supreme Court has recognized that "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, [and] the change in identity of the interrogators all bear on whether the coercion has carried over into the second confession." (*Oregon v. Elstad* (1985), 470 U.S. 298, 310, 84 L. Ed. 2d 222, 232-33, 105 S. Ct. 1285, 1294.) Thus, the coercive effect of an interrogation made without the aid of any advisement of *Miranda* rights can be dissipated and leave untarnished a subsequent interrogation. It follows from this analysis that a stronger and more compelling case of

noncompulsive police questioning is presented where, as here, the accused is fully advised of his *Miranda* rights, granted his request for counsel during initial interrogation, and is then later "taken into custody by the second authority, removed both in time and place from his original surroundings, and [again] adequately advised of his rights and given an opportunity to exercise them." *Westover v. United States* (1965), 384 U.S. 436, 496, 16 L. Ed. 2d 694, 736, 88 S. Ct. 1602, 1639.

As a result we determine that the FBI's knowledge that the defendant here asserted his right to counsel during FBI questioning in Miami in July 1982 should not be imputed to Chicago authorities when they initiated interrogation of the accused upon his return to Chicago in October. Based upon this determination, we conclude that defendant's waiver of his right to counsel in Chicago was valid if it was knowing, intelligent, and voluntary. Following a suppression hearing the trial court found that defendant's waiver was voluntary, knowing, and intelligent under the totality of the circumstances. Defendant does not dispute this factual determination on appeal. Accordingly, we hold that defendant's inculpatory statement to Chicago authorities was properly admitted into evidence at defendant's trial.

## II

■ As an alternative holding, we determine that even if the introduction of defendant's October 1982 statement were error, it was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Our review of the trial record as a whole compels the conclusion that there is overwhelming evidence to support the defendant's conviction of murder. See *People v. R. C.* (1985), 108 Ill. 2d 349, 355-56, 483 N.E.2d 1241; *People v. Gonzalez* (1984), 104 Ill. 2d 332, 338-39, 472 N.E.2d 417, 420-21.

Evidence in the record to prove defendant guilty beyond a reasonable doubt was substantial. It was established at trial that defendant and White left the cocktail lounge together on July 8, 1977. Three days later her body was found in defendant's apartment. It had 11 stab wounds and was mutilated and dismembered. It was apparent that she had been dead for some time, as her decomposing body had begun to give off odors noticeable to others in the building. A knife discovered under the mattress where White was found had been given to defendant to perform his janitorial duties in Chicago. The medical examiner testified that White's wounds were produced by a weapon with a slim blade and a sharp edge, characteristics which corre-

sponded with the weapon produced by the State. Although the knife was normally stored on a shelf at the defendant's place of employment, it was found by the police in defendant's apartment. Other than the blood found surrounding White's body, no other evidence of blood was found in the apartment and there was no visible sign of any altercation or struggle. On July 15, defendant admitted to his supervisor that he had killed White, and he thereafter fled to Miami, Florida. All of this evidence proved defendant guilty of the murder of White.

Defendant argues that admission of his October 1982 statement cannot be considered harmless beyond a reasonable doubt because it contradicted and thereby called into question the credibility of his earlier statement to his supervisor. According to this earlier statement, defendant killed White because she threatened him with a knife; defendant then took the weapon away from White and stabbed her. Defendant reasons that the jury could have reasonably concluded, based upon this admission, that defendant acted either in self-defense in killing White, or that his conduct amounted to voluntary manslaughter.

We are unpersuaded by this argument. Defendant's statement to his supervisor indicated only that White threatened defendant with the possibility of physical harm if he attempted to recover the additional money she had taken, rather than with the certainty of fatal physical injury sufficient to justify his killing her. More importantly, the physical evidence established that there was no struggle in the apartment, that White was stabbed almost a dozen times, and that her body had been mutilated and dismembered. This evidence demonstrated that defendant did not act in either an unreasonable or a reasonable belief of self-defense when he killed White. As a result we cannot conclude that the evidence produced below, absent defendant's October 1982 inculpatory statement, failed to prove defendant guilty beyond a reasonable doubt of the murder of White.

### III

Defendant contends that the trial court's sentence of 200 to 500 years' imprisonment is reversible error as an abuse of discretion. Specifically he claims that the trial court failed to take into account his potential for rehabilitation.

Defendant elected to be sentenced under the Unified Code of Corrections in effect in 1977. Under the 1977 Code, a defendant convicted of murder could be imprisoned for a minimum term of 14 years and a maximum term in excess of 14 years; the court has the authority to set a higher minimum term upon consideration of the nature

and circumstances of the offense and the history and character of the defendant. Ill. Rev. Stat. 1977, ch. 38, pars. 1005—8—1(b)(1), 1005—8—1(c)(1).

It has long been recognized that "the spirit and purpose of the law are upheld when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant." (*People v. Carlson* (1980), 79 Ill. 2d 564, 587, 404 N.E.2d 233, 243.) The Illinois Supreme Court has repeatedly emphasized the impropriety of a reviewing court substituting its judgment or preference as to punishment for that of the sentencing court, on the ground that the trial judge is in a superior position to tailor a sentence to the needs of each individual case. (*People v. Steppan* (1985), 105 Ill. 2d 310, 323, 473 N.E.2d 1300; *People v. Hicks* (1984), 101 Ill. 2d 366, 375, 462 N.E.2d 473.) Thus a trial court's decision regarding sentencing is entitled to great deference and weight and absent a clear abuse of discretion may not be disturbed on review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.

Defendant argues that the trial court did not consider his rehabilitative potential and that its failure to do so constituted an abuse of discretion. The trial court was not required to make specific findings concerning the defendant's rehabilitative potential, however. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 493, 431 N.E.2d 344.) Furthermore, an examination of the record reveals that the trial court considered all the relevant factors of the case, including counsel's arguments during the hearing in aggravation and mitigation, in reaching its decision as to sentencing. The record here clearly indicates the seriousness of the crime of which defendant was convicted, as well as the brutality with which it was committed. In our opinion the mitigating factors of defendant's work history, absence of a criminal record, and length of residence, when compared to the heinousness of defendant's acts, afford insufficient basis upon which to interfere with the sentence imposed by the trial court. (See *People v. Baker* (1978), 57 Ill. App. 3d 401, 372 N.E.2d 438; *People v. Henry* (1973), 16 Ill. App. 3d 429, 306 N.E.2d 668, *appeal denied* (1974), 56 Ill. 2d 584.) We therefore cannot conclude that the sentence imposed by the trial court was reversible error as an abuse of discretion.

For the reasons set forth above, the judgment of the trial court is affirmed.

Affirmed.

LINN, P.J., and JIGANTI, J., concur.