THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RAUL GARCIA, Defendant-Appellant.

First District (3rd Division)   No. 84—2755

Opinion filed May 27, 1987.

James J. Doherty, Public Defender, of Chicago (Andrea Monsees and Judith A. Stewart, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Paula M. Carstensen, and Bonnie Meyer Sloan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a bench trial, defendant, Raul Garcia, was found guilty but mentally ill of attempted murder, four counts of aggravated battery, and two counts of armed violence. Defendant was sentenced to a term of 12 years for attempted murder. On appeal defendant argues that the State failed to sustain its burden of proof with regard to his defense of insanity. We reverse and remand.

The facts surrounding the incident in question are not in dispute. Prior to the occurrence at issue here, defendant and his brother Rudolfo, the victim, were living in their mother's house along with several other family members and Rudolfo's fiancee, Linda. On the morning of June 30, 1983, at approximately 3 a.m., defendant entered the basement, where Rudolfo and Linda were sleeping on a couch. Defendant repeatedly stabbed Rudolfo and then left the house. Defendant was subsequently arrested around 5 a.m., when the police were notified that he had returned home. After being advised of his *Miranda* warnings, defendant led the police officers to the location of the knife that he used to stab Rudolfo. Defendant was then taken into custody and interrogated.

On July 1, 1983, pursuant to court order, defendant was examined by Dr. Stephen Cann, a staff psychiatrist for The Psychiatric Institute. Dr. Cann's report indicates that he diagnosed defendant as psychotic, with gross delusions and thought disorder. Cann's report further states that he found defendant unfit to stand trial. Thereafter, a fitness hearing for defendant was held on November 30, 1983. During the hearing, Dr. Gerson Kaplan, a psychiatrist, testified that pursuant to court order he examined defendant on September 27, 1983. Kaplan stated that prior to his examination of defendant, he reviewed the psychological examination of defendant prepared by a staff psychiatrist, the police reports concerning the stabbing, the grand jury transcript, and defendant's social service history. Based on the documentation provided and an examination of defendant, Kaplan testified that in his opinion, defendant was suffering from a schizophrenic disorder, paranoid type, and was not mentally fit for trial. Kaplan further opined that defendant was legally insane at the time of the stabbing because he was unable to control his behavior in conformity with the law. Thereafter, the trial court found defendant unfit to stand trial and committed him to the Department of Mental Health. Defendant

was then placed in Elgin Mental Health Center, a maximum security facility.

Following six months of treatment at Elgin, which included the daily administration of psychotropic drugs to control hallucinations, defendant received a second fitness hearing.[1] At the hearing, Dr. Kaplan testified that he examined defendant for a second time on June 13, 1984. Kaplan explained that prior to examining defendant, he reviewed his previous psychological report of defendant, reports from Elgin, and a recent psychological examination of defendant conducted in June of 1984. Kaplan then testified that while defendant was still a sick man, he had improved sufficiently to be found fit for trial with medication.[2] Defendant was subsequently restored to fitness for purposes of trial.

At trial, Linda Garcia testified as the State's first witness. Linda stated that on the morning in question, she was asleep next to Rudolfo on a couch in the basement when she heard Rudolfo moaning. Linda indicated that she woke up, heard slapping noises, and saw defendant standing over Rudolfo, apparently hitting him. When Linda then began screaming, defendant ran from the room. Linda stated that she then saw blood on Rudolfo, realized that he was hurt, and ran for help. On cross-examination, Linda testified that although she lived in the same house as defendant, she never spoke to defendant because he was very quiet and kept to himself. Linda indicated that she was not aware of any disagreement between defendant and Rudolfo.

Rudolfo Garcia, Jr., testified next for the State. Rudolfo claimed that he had a close relationship with defendant as a child. Rudolfo then stated that he left home when he entered the Marines. When Rudolfo left the Marines in April 1982, and returned home, he realized that defendant was having problems with the family and that nobody was talking to him. Rudolfo testified that he tried to "break the ice" but had no success. Rudolfo further testified that he had an argument with defendant about one year prior to the incident in question when defendant was intoxicated and insulted one of Rudolfo's friends. According to Rudolfo, he was also a "little drunk" and had grabbed

[1]Psychotropic drugs are drugs which directly act on the brain. Following defendant's admittance to Elgin Mental Health Center, defendant was administered Trifluoperazine. Trifluoperazine is an antipsychotic drug utilized to control visual and auditory hallucinations.

[2]Defendant was to continue receiving Trifluoperazine during the course of his trial. However, the record does not reflect whether or not defendant continued Trifluoperazine treatment during trial.

defendant by the throat. Rudolfo's friends separated them. Rudolfo testified that defendant then stated, "[O]ne of these days I'm going to get you while you're asleep."

On cross-examination, Rudolfo testified that while he was in the Marines, he received numerous phone calls from his sisters telling him that they were frightened of defendant. His sisters would explain the reasons for their fears to Rudolfo and advise him of the trouble that defendant was causing at home. Rudolfo further testified that he saw defendant disoriented once or twice the summer before he returned home permanently. According to Rudolfo's testimony, defendant was usually in his room, and Rudolfo would hear defendant talking to himself and laughing, even though he was alone and the radio and television were off. Rudolfo concluded by stating that defendant was never violent in his presence.

On redirect examination, Rudolfo testified that even though defendant had just started a job and was also beginning to go outside, defendant spent the majority of his time alone in his room. At dinner time, defendant would grab his dinner plate and run into his room to eat. Rudolfo indicated that defendant's room did not have a door and that the curtains were always shut.

Another State witness, Officer Peter Rodgers, testified that when he arrested defendant, he placed defendant in handcuffs to restrain him. Defendant was totally cooperative. Rodgers also stated that when defendant showed him where the knife was located, his voice sounded normal and defendant had no expression on his face. Rodgers further testified that while defendant was in custody at the police station, he heard defendant tell one of the other officers something about "Astros."

Assistant State's Attorney Kevin Durkin was the final witness to testify for the State. Durkin stated that prior to interviewing defendant on June 3, 1983, he advised defendant of his *Miranda* rights. Defendant indicated that he understood his rights. Durkin then asked defendant if he wanted to talk, and defendant said yes. Defendant stated that on the morning in question he woke up and walked into the kitchen to look for a knife. Defendant told Durkin that he wanted the sharpest knife but could not find it. He then settled for the one the police have. After obtaining a knife, defendant went into the basement where Rudolfo was sleeping and stabbed him many times. Defendant then ran and hid under a porch. Durkin further testified that he asked defendant if Rudolfo had done anything to provoke him or if Rudolfo had ever hit defendant. Defendant responded no. Durkin also stated that he asked defendant why he stabbed Rudolfo, and

defendant replied that he thought it had something to do with a drug overdose he suffered a few years ago.[3]

Defendant called Dr. Gilbert Bogen, a psychiatrist, as his first witness. Dr. Bogen had examined defendant pursuant to court order. Bogen explained that prior to interviewing defendant he reviewed numerous materials, including psychological reports completed by his staff psychiatrists, two reports from Dr. Kaplan, a synopsis letter from Elgin Mental Health Center, a social service report consisting of information on defendant provided by his mother and brother, the grand jury arraignment report, and the police reports. According to Bogen, the social service report indicated that defendant had been behaving in a number of psychotic ways for two years prior to the incident in question. Specifically, defendant's behavior included: (1) walking around the house naked; (2) talking about people watching him; (3) saying that he was hearing voices; (4) preferring to stay in his bedroom alone, pounding on the wall, standing and looking in the mirror for extended periods of time; (5) laughing and talking to himself; (6) claiming to have seen visions of the devil's face; and (7) being picked up by the police in the middle of an expressway after walking 45 miles.

Bogen further testified that his interview with defendant consisted of a question and answer session designed to arrive at a determination of defendant's mental status, reach a diagnosis, and then examine defendant's sanity. Bogen indicated that when he questioned defendant about his memory of the events of June 3, 1983, defendant provided him with some background into the concept defendant refers to as "Astros." According to defendant, "Astros" were spirits of some kind which communicated with him. However, Bogen stated that it was unclear whether or not the "Astros" were purely in thought form or if defendant actually heard voices.

Bogen then testified concerning his diagnosis of defendant. He explained that defendant definitely had what is known as a delusional system and that in his opinion defendant was a schizophrenic paranoid. It was Bogen's opinion that at the time of the stabbing, defendant had the ability to appreciate the criminality of his conduct but was unable to conform his conduct in accordance with the law.

On cross-examination, Bogen testified that a schizoid personality

---

[3]Our examination of the record indicates that defendant gave several conflicting stories regarding his use of drugs to various mental health personnel. It is unclear whether or not defendant was in fact a drug user or suffered a drug overdose. However, the record does support defendant's statements that he has not used drugs for several years.

disorder is what is commonly known as a mental disease or defect. He explained that the symptoms of schizophrenia which defendant exhibited included auditory and visual hallucinations, withdrawn behavior, bizarre behavior, and laughing and talking to himself. He further indicated that schizophrenic symptoms need not always be present. Bogen explained that defendant's history of being withdrawn is a symptom itself and that emergence from a period of withdrawal for a time does not negate the fact that defendant was withdrawn initially. Bogen also stated that the permanence of defendant's delusional system, which consisted of beliefs not shared by anyone else such as his concept of "Astros," was indicative of paranoia. He also testified that even if defendant was coherent on the day of the stabbing, it only meant that he was coherent at that time. Moreover, such a fact, if true, would not alter his opinion on defendant's sanity. Bogen also indicated that while he was not aware of defendant's brief employment or occasional basketball playing, such facts, if true, would not change his opinion and diagnosis of defendant. Bogen further testified that the fact that defendant now thought the "Astros" were just in his thoughts as opposed to spirits which actually communicated with him would likewise not alter his diagnosis of defendant.

Dr. Gerson Kaplan, a psychiatrist, was defendant's final witness. Dr. Kaplan testified that he also examined defendant pursuant to court order. Prior to interviewing defendant, Kaplan reviewed substantially the same material as that reviewed by Dr. Bogen. Kaplan testified that his diagnosis was that defendant was a schizophrenic paranoid. Kaplan further testified that while he could not render an opinion as to whether defendant could appreciate the criminality of his acts, he did believe that defendant was unable to conform his conduct to the requirements of the law at the time of the crime due to mental disease, namely schizophrenia, paranoid in type. Kaplan explained that in arriving at an opinion regarding the sanity of an individual, a psychiatrist first looks for a history of disturbed behavior preceding the alleged crime and then for disturbed behavior, both at the time of the incident in question and afterward. In Kaplan's opinion, defendant exhibited a continuous pattern of disturbed behavior before, during, and after the incident in question.

Kaplan next testified regarding his question and answer interview with defendant. Kaplan stated that during the interview, defendant explained that he had been hearing voices, those of the "Astros," telling him to harm his brother for a long time. Defendant claimed that he had been fighting the voices but that on the morning in question he could no longer fight. Defendant stated that he felt badly about

what had happened but could not fight the "Astros" any longer. Kaplan further testified that defendant described the "Astros" as dead people who appear to be alive. According to defendant, the "Astros" had been bothering him for a long time.

On cross-examination, Kaplan testified that the emphasis of his interview with defendant was on the time immediately preceding the stabbing. He stated that in his opinion defendant had a persecution complex, was delusional, and had oratory hallucinations. Defendant also had a profound disturbance of his sense of self and a volitional problem evidenced by his inability to ignore the voices commanding him to harm Rudolfo. Kaplan also testified that he was unaware of the fight between defendant and Rudolfo and defendant's comment to Rudolfo at the time. He was likewise unaware of defendant's brief employment history immediately prior to the alleged crime or of the substance of defendant's conversation with the assistant State's Attorney concerning a drug overdose.

On redirect examination, Kaplan testified that knowledge of defendant's argument with Rudolfo and the threat which occurred thereafter would not affect his opinion and diagnosis of defendant. He further stated that knowledge of defendant's brief employment or occasional basketball playing would likewise not alter his diagnosis or opinion of defendant's sanity. Kaplan concluded that the evidence was overwhelming that defendant was suffering from a severe psychosis both prior to and during the crime.

Rudolfo's wife, Linda, was called as a rebuttal witness for the State. Linda testified that defendant did not seem in a trance at the time of the stabbing. She further testified that he seemed totally calm and that his face appeared normal.

Following a waiver of closing arguments, the trial court found defendant guilty but mentally ill (Ill. Rev. Stat. 1983, ch. 38, par. 115—3(c)) on all charges. The court remarked that it was of the "firm opinion that the evidence of *** defendant's guilt *** [was] absolutely overwhelming and irrebutable." Defendant then filed a post-trial motion, which was denied. This appeal followed.

■ Defendant essentially argues that the State failed to meet its burden of proof with regard to the defense of insanity, thereby requiring reversal of his conviction. At the time of defendant's trial, a person was considered insane and not legally culpable for his actions if, as a result of mental disease or mental defect, he lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1977, ch. 38, par. 6—2(a).) In order to advance an insanity defense, defend-

ant was required to introduce sufficient evidence to establish a reasonable doubt of his sanity. The State then had the burden of proving that defendant was sane beyond a reasonable doubt. (*People v. Arndt* (1980), 86 Ill. App. 3d 744, 749, 408 N.E.2d 757, 760-61.) Here, the question of defendant's sanity was for the trial court, as the trier of fact, to determine. Such a decision may not be set aside unless the evidence raises a reasonable doubt of defendant's sanity. *People v. Arndt* (1980), 86 Ill. App. 3d 744, 749, 408 N.E.2d 757, 760-61.

We believe that the record convincingly establishes that at the time of the incident, defendant was suffering from a recognized mental illness, schizophrenia, paranoid in type. This condition resulted in a severe psychosis which caused defendant to have a persecution complex, delusions, possible oratory hallucinations, a profound disturbance of his sense of self, and a volitional problem evidenced by his inability to ignore the voices commanding him to harm Rudolfo. Both psychiatrists who testified were of the opinion that defendant could not conform his conduct to the requirements of the law at the time of the stabbing. Further, based on the trial court's comments, it does not seem that the court questioned the credibility of the psychiatrists it appointed to examine defendant. Rather, the court merely seemed to draw different conclusions than the psychiatrists did.

Here, the record indicates that Dr. Cann conducted an examination of defendant less than one day after the alleged crime. He was therefore in an excellent position to evaluate defendant's condition, a condition which had apparently existed for a number of years. His diagnosis that defendant was psychotic with gross delusions and thought disorder one day after the incident in question refutes the testimony that defendant was sane as shown by his lucidity and cooperative attitude at the time of his arrest and interrogation. Moreover, it was the opinion of both Dr. Bogen and Dr. Kaplan that defendant's alleged coherence at the time of his arrest is not inconsistent with their diagnosis of insanity. The evidence was not refuted by the State. To the contrary, some of the State's evidence supports the conclusions of the psychiatrists.

■ Clearly, there is substantial, reputable evidence in the record that defendant's mental processes were so gravely impaired on June 30, 1983, that defendant lacked the ability to conform his conduct to the requirements of the law. As such, we believe that there exists a reasonable doubt of defendant's sanity at the time of the stabbing. Accordingly, we need not address the other issues defendant has raised on appeal. We, therefore, reverse the judgment of the trial court and remand this case for entry of a finding of not guilty by rea-

son of insanity. The court is then directed to proceed in accordance with section 1005—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—4) concerning such disposition.

Reversed and remanded with directions.

McNAMARA, P.J., and WHITE, J., concur.