THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH BAKER, Defendant-Appellant.

First District (5th Division)   No. 1—89—1610

Opinion filed August 20, 1993.

Rita A. Fry, Public Defender, of Chicago (Stephen L. Richards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Guy L. Miller, and Sandra Z. Nueschen, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Defendant, Kenneth Baker, was arrested and charged with murder in connection with the death of his parents. At his trial, defendant raised the insanity defense pursuant to section 6—2 of the Criminal Code of 1961. (Ill. Rev. Stat. 1989, ch. 38, par. 6—2.) The trial court found defendant guilty but mentally ill and subsequently sentenced him to natural life in prison. On appeal, defendant raises numerous issues, among them that the trial court's finding of guilty but mentally ill was against the manifest weight of the evidence and that the trial court erred in admitting his confession into evidence because it was

improperly obtained after he had invoked his fifth amendment right to counsel. For the reasons set forth below, we reverse and remand.

FACTS

On May 7, 1986, Louis and Leora Collier, defendant's parents, were shot to death in their home. On May 8, 1986, defendant, who left Chicago the previous day by car, was approached by police in Ogallala, Nebraska, after his car had veered off the highway and crashed into a telephone pole. Defendant was driven to the Nebraska State Patrol office in connection with this accident. The Nebraska police subsequently learned that defendant was wanted for a double murder in Chicago and began to question him. In response to a question from a Nebraska officer, defendant told them that he had been hospitalized for psychiatric problems during the previous year (December 1985). After approximately 10 minutes of questioning, defendant said he was confused and asked to see a psychiatrist and speak with an attorney. The Nebraska police immediately ceased their questioning.

The next day, two Chicago police detectives, James Pienta and William Marley, arrived. The Nebraska authorities informed them that defendant had indicated that he wanted to speak with an attorney. The Chicago detectives proceeded to the jail where defendant was being held and met defendant in an interview room, intending to ask defendant to waive extradition. They introduced themselves and then reread defendant his *Miranda* rights. The defendant then confessed to the killing of his parents.

Prior to trial, defendant moved to quash the arrest and suppress certain evidence, including his confession to the Chicago detectives. At the suppression hearing, the following evidence was heard.

Keith Stricker, a Nebraska police officer, testified that on May 8, 1986, he responded to a suspicious person call and found defendant standing in a lobby of a Holiday Inn in Ogallala. Stricker stated that defendant appeared "somewhat disoriented" and was wearing soiled and wet clothing. Defendant told him that he had been involved in an accident and was suffering from amnesia. Defendant said he had come from Chicago and was on his way to Las Vegas. Stricker called in and was informed that a Nebraska State trooper was looking for defendant in connection with the accident involving defendant's car. He asked defendant to accompany him to the station and defendant complied. At the station, he turned defendant over to Nebraska State Trooper Bridges.

Trooper Bridges testified that he came across defendant's car in the middle of a field and noticed that it had damaged several delineator, deflector, and wooden fence posts along the highway. After determining that the car belonged to defendant, Bridges called defendant's home and spoke with defendant's brother, Allen, who informed him that defendant was wanted in connection with a double murder in Chicago. Bridges stated that after confirming this with the Chicago police, defendant was placed under arrest for homicide and informed of his *Miranda* rights.

Bridges stated that defendant appeared somewhat confused when he spoke to him and that he seemed to have trouble remembering facts such as his address or the names of his relatives. Bridges testified that until defendant's request to see a psychiatrist, which was made when he was subsequently questioned about the homicide, he saw no indication that defendant was in need of a psychiatrist.

On cross-examination, Bridges admitted that a short time after he was picked up, defendant stated that "they are kicking and screaming and scratching" and then patted his chest and said, "I am in here right." Defendant then asked another policeman for his gun so he could shoot himself. At this point, the officers asked defendant whether he had ever been hospitalized for psychiatric problems and were told by defendant that he had been hospitalized the previous year.

Investigator Mel Messersmith of the Nebraska State Patrol testified that when he spoke with defendant on May 8, 1986, he appeared to be a "little in disarray" and that his clothes were dirty. He indicated that he informed defendant of his *Miranda* rights and questioned him for approximately 10 minutes. During this questioning, the defendant would sometimes not respond to questions and kept saying that he didn't know. Messersmith described the defendant as evasive and said that he appeared not to be telling the truth. Messersmith ended the interrogation when defendant said that he was confused and that he wanted a lawyer and a psychiatrist. He did not see or hear anything that led him to believe that defendant had mental problems.

Messersmith testified that on May 9, 1986, two Chicago detectives, James Pienta and William Marley, arrived and asked to speak with defendant. Defendant was then placed in an interview room and the Chicago detectives entered and introduced themselves. Messersmith confirmed that he did not make any attempts to get an attorney or a psychiatrist for defendant after he made his request. According

to Messersmith, defendant never asked to speak with any police officers.

Chicago Detective Pienta testified that he and his partner, Detective Marley, were assigned to travel to Nebraska and determine if defendant would waive extradition. He met with Trooper Bridges and Investigator Messersmith on the morning of May 9, 1986, at which time Messersmith told him that he had had a short conversation with defendant and that during that conversation defendant indicated that he "thinks he wanted a lawyer" or "he thinks that he needs one."

Pienta testified that after talking to Messersmith, he and his partner went directly to the jail where defendant was being held and met defendant in an interview room. When they walked into the room, they identified themselves as Chicago police detectives and informed defendant of his *Miranda* rights. Pienta read each of the rights to the defendant individually. After each right, Pienta asked defendant if he understood that right. Pienta said that defendant then stated that he knew why they were there and "started rambling on." Defendant spoke for approximately 10 or 15 minutes, confessing to the murder of his parents. Pienta said that his partner reduced the statement to writing, telling defendant to slow down several times because he could not write that fast. Pienta indicated that during his confession, defendant kept repeating or at least mentioned, "The father died before the son."

According to Pienta, defendant was responsive and did not appear to be confused. Pienta did not ask defendant any questions prior to his confession nor did he ask defendant if he still wanted to speak with an attorney. In response to a question by the court, Pienta stated that he read defendant his *Miranda* warnings because it was his practice to do that when he talked to a suspect.

Detective Marley testified, corroborating Pienta's testimony. Marley added that when Messersmith told them that defendant said that he thought he might need a lawyer, the Nebraska officers stopped questioning him. Marley said that defendant did not say anything which indicated that he was confused and that defendant's statement appeared coherent.

The trial court denied defendant's motion to quash the arrest and suppress his confession. Defendant waived his right to a jury trial and a bench trial was held. At the trial, the testimony of Nebraska officers Stricker, Bridges, and Messersmith was admitted into evidence pursuant to a stipulation. Detective Pienta testified at trial. His testimony was substantially the same as his earlier testimony at the hearing on the motion to suppress.

Detective Marley's testimony at trial was also consistent with the testimony he gave at the suppression hearing. Marley also testified to the substance of defendant's confession, stating that defendant said that he got into an argument with his father over a "method of religion" and became upset. He went to his bedroom where he retrieved a gun, which belonged to his brother Andre, from a locked toolbox in his room. He returned to his father and told him "the father dies before the son." His father went for his throat and he shot at his father. His father started to run and he fired several more shots at his father, who then fell in a utility room. He turned to his mother whom he shot and then stabbed. Afterwards, he returned to his father and stabbed him. After he stood there and looked at them for awhile, he got into his Camaro intending to go to Las Vegas. After reaching Ogallala, Nebraska, defendant drove his car off the highway.

Marley added that they were with defendant for half an hour before they completed taking his statement. During that time, defendant did not show any emotion and spoke in an even tone. Marley said that during that time they asked defendant one or two questions concerning his possible willingness to waive his extradition rights.

Henry Gauthier testified on behalf of the State that he was a supervisor at the Chicago Transit Authority (CTA) garage where defendant worked as a bus repairman. According to Gauthier, defendant was quiet and a good worker. Gauthier said that on the date of the killings, May 7, 1986, defendant was acting "erratically." Instead of completing the repairs on one bus before moving to the next, he simply kept moving from bus to bus without finishing any of the repairs. When asked by Gauthier why he was working that way, defendant just shrugged his shoulders and said he would fix it. Defendant appeared withdrawn on that day and was initially unresponsive to Gauthier's questions. Gauthier commented that after defendant's return to work following his hospitalization for psychiatric problems in December 1985 he was generally "a little bit more quiet."

The first witness for the defense was William Bailey, a longtime friend of defendant, who testified that defendant was hospitalized for psychiatric problems in December 1985. According to Bailey, after defendant was hospitalized, he became withdrawn and slept "weekends at a time." He stopped socializing with people.

Bailey said that on the morning of May 7, 1986, he saw defendant outside of his home and thought it was unusual because defendant should be at work. He asked defendant what he was doing at home and defendant shrugged his shoulders and did not say anything. He

asked defendant whether he was going back to work and again defendant remained silent and shrugged his shoulders.

Bailey stated that defendant once pointed a gun at him in April 1986, which he described as out of character for defendant. He said he went to defendant's home and found defendant watching the movie Faces of Death. Defendant looked up at him when he entered the room and "asked me was I one of them," proceeding to point the gun at him. Bailey moved the gun away, but defendant pointed it back at him again. Bailey became worried because "the way he was looking at me wasn't right, it wasn't the Kenneth I grew up with." Bailey then left; he did not tell anyone about the incident or contact the police. Bailey described defendant as "fairly intelligent."

Steven Hendricks testified that after his hospitalization in December 1985, defendant became uncooperative, did not want to go out and began sleeping a lot after work. Hendricks related an incident which occurred approximately four days before the killings. Hendricks explained that he was to attend a jacket and tie party with defendant. When he went to pick up defendant, defendant was wearing work clothes and insisted he was "dressed" for the party. Hendricks told defendant to get dressed and defendant left, returning 15 minutes later wearing the same clothes insisting that he was now "dressed." Otherwise during the year of 1986, Hendricks never saw defendant perform any "crazy" or "insane" acts or act irrationally.

Michael Baker, defendant's brother, testified that in December 1985 his brother had a "breakdown." At that time, defendant was acting hysterical and did not know who anybody was. He said that defendant continued to have mental problems after his release from the hospital, but saw no reason why he should be hospitalized. He stated that defendant had a good relationship with his mother and father.

Mark Baker, defendant's brother, testified that in November and December 1985, defendant exhibited unusual behavior, indicating that he believed someone was after him and stating that he "had to keep moving." He corroborated Michael's account of defendant's breakdown and said that defendant wrongly thought that their brother Alan had been shot and killed. He stated that he only saw defendant once immediately after his hospitalization and did not see him before the killings.

Andre Collier, defendant's brother, testified that in November 1985, defendant pulled a gun on him and kept asking whether he was there to "take him out" or "get him." He testified that he kept a gun on the closet shelf of the bedroom that he and defendant occupied. He

said after a while he noticed that the gun was no longer on the closet shelf. He stated that he was afraid of his brother because he was mentally ill.

Diane Cotton, defendant's sister, recounted defendant's hospitalization in December 1985. She said that defendant spent Christmas Eve at her house that year and acted very strange. He would not interact with the family and became agitated when she wanted to take his picture. She said defendant's loss of contact with reality in December 1985 was the only time she had seen him lose control. However, she related an incident where defendant was acting "real frightened" and had told her that someone who was after him had killed their brother Alan by mistake.

Karen Baker, defendant's sister, testified that in the fall of 1985, defendant began to act like he was in another world. He was not better after his hospitalization and was still in need of treatment.

Defendant also called four expert witnesses in his defense. Dr. Glenn Prentice, a psychiatrist, testified that he examined defendant on March 3, 1987, interviewing him for approximately 2½ hours. He reviewed the reports of the three other psychiatrists, hospital records, police reports, and the transcript of the motion to suppress. Based on all this information, Dr. Prentice opined that defendant was suffering from schizophrenia when he killed his parents. He described schizophrenia as a psychotic mental disorder and explained that schizophrenia is a chronic illness, although a patient will go through periods where it is very symptomatic causing great difficulty and other periods where its effects are not so overwhelming. Dr. Prentice stated that there was no difference in substance between his diagnosis and the diagnoses of the other professionals who examined defendant and whose records he reviewed. He explained that a schizo-affective disorder had more to do with feeling than thinking. He opined that this diagnostic difference did not change the consequences of the illness.

Considering defendant's psychotic disorder, Dr. Prentice opined that defendant was unable to appreciate the criminality of his behavior when he killed his parents and was unable to conform his behavior to the law. He stated that the symptoms defendant exhibited prior to his admission to the hospital in December 1985 supported his diagnosis that defendant was suffering from schizophrenia.

Dr. Prentice testified that when the defendant was hospitalized in December of 1985 he was in an "acute psychotic state." He stated that defendant was diagnosed as suffering from schizophrenia during that hospitalization and was treated with anti-psychotic medication. The records from this hospitalization indicated that defendant was

withdrawn and had not been sleeping well. Defendant also had a "blank look," short attention span, and was suspicious of others, thinking that his friends were playing tricks on him. Dr. Prentice stated that the records also noted that defendant had very poor insight into the fact that he was ill. The records from defendant's hospitalization also indicated that his speech was fragmented and he had an unkempt appearance. Dr. Prentice testified that "fragmented speech" is a term of art which indicates that a person's speech is disjointed and hard to follow. Dr. Prentice explained that this is a symptom of a thought disorder and that a thought disorder is one of the signs of schizophrenia.

Dr. Prentice further noted in forming his opinion that during the time immediately preceding and in the immediate aftermath of the incident, defendant's thoughts were disordered and he was hearing voices telling him what to do, including voices telling him to go to Las Vegas. Dr. Prentice opined that defendant's inability to comprehend the nature of reality was demonstrated by remarks in the Nebraska police report which noted that defendant appeared disoriented and asked for a gun to shoot himself.

Additionally, Dr. Prentice explained that "the rapid or pressured speech" in which defendant gave his confession is a common indication of psychotic behavior. He stated that the confession's reference to religion ("methods of religion") and defendant's apocalyptical remark that the "father dies before the son" were typical of what a psychotic person might say. He also relied on reports of defendant's stay in the county jail's psychiatric unit between May 12, 1986, and May 14, 1986, and his periodic treatment through February 22, 1987. These reports indicated that defendant had a "flat affect," indicating a lack of emotion, and that he acted withdrawn and detached. The reports also showed that defendant was treated with anti-psychotic medication during this period.

Dr. Prentice was of the opinion that defendant's encounter with Bailey in April 1986 and defendant's confession to the police made it a "hard logical position to take" that defendant was sane at the time of the killings. Dr. Prentice rejected the suggestion that defendant's trip to Nebraska was evidence of his sanity, stating that defendant was in a "psychotic confused state" and was panicked. He also rejected the notion that defendant was malingering, stating that at the time he interviewed defendant, defendant lacked insight into the fact that he was ill and could not accept the fact that he needed treatment. He admitted that he was unable to determine defendant's thoughts during the killings because defendant never described what

he was thinking at the time, but indicated that defendant was confused and delusional moments after the incident.

Dr. Matthew Markos, a forensic psychiatrist employed by the circuit court of Cook County Psychiatric Institute, testified that he had examined defendant on three occasions, February 22, 1988, April 28, 1988, September 21, 1988, for approximately 45 minutes to one hour each time. He stated that he reviewed the "extensive police reports and investigator reports," reports prepared by Drs. Rabin, Prentice and Stipes, records from defendant's hospitalization in 1985 and his post-arrest treatment which extended from May 12, 1986, through February 1987, and the transcript from the pretrial hearing in forming his opinion. He opined that at the time of the alleged offense, defendant was suffering from a schizo-affective disorder which he described as a psychotic mental illness characterized by a form of thought disorder.

Dr. Markos initially noted that defendant had been examined by "numerous trained psychiatrists" and had been "consistently diagnosed" as having psychotic symptoms. He opined that defendant had exhibited symptoms of schizophrenia, but that in addition to those symptoms, he exhibited symptoms of a schizo-affective disorder. He agreed with Dr. Prentice that the difference present in the diagnoses is "an academic one" and that it did not change his ultimate determination as to defendant's insanity. He explained that everyone who evaluated defendant determined that he suffered from a psychotic illness.

Dr. Markos concluded that at the time of the offense, defendant was suffering from a serious mental disorder and as a result of this disorder defendant lacked the capacity to appreciate the criminality of his acts and to conform his behavior to the requirements of the law. Dr. Markos cited the evidence in the police reports which supported his conclusion, including defendant's strange responses like the "father must die before the son" and that there was screaming and scratching inside of him. He said that defendant's leaving the scene of the killings after the murder did not necessarily indicate that defendant was able to appreciate the criminality of his actions. Defendant's statement that the father must die before the son indicated that defendant was confused and in fear because he thought that he would be killed next.

Like Dr. Prentice, Dr. Markos dismissed the possibility that defendant was malingering, stating that a patient feigning his illness would be exposed when examined by several evaluators over a period of time as defendant here had been examined. He also agreed with

Dr. Prentice as to the import of the incident related by William Bailey, stating that it was "classical" and "typical of psychotic buildup." Dr. Markos admitted that a person suffering from schizophrenia can perform legally sane acts where his conduct conforms to the law and also have periods of insane behavior.

Dr. Michael Rabin, a clinical psychologist who like Dr. Markos was employed by the circuit court of Cook County Psychiatric Institute, testified that he had examined defendant three times. On February 19, 1987, he examined defendant for approximately two hours. He also examined defendant on July 17, 1987, and February 22, 1988. He reviewed the same materials as Drs. Prentice and Markos. After examining defendant and reviewing these materials, he concluded that defendant suffered from a schizo-affective disorder. He agreed with Drs. Prentice and Markos that the police reports indicated that defendant was exhibiting psychotic behavior. Dr. Rabin also noted that even with medication, defendant was psychotic for seven months after the incident. He said the difference between his diagnosis and a schizo-affective disorder is "partly academic" and that they are very similar. Dr. Rabin agreed with Drs. Prentice and Markos that defendant was legally insane at the time of his crime. He conceded that this determination was "a little more difficult" because defendant never admitted committing the murders, but nevertheless concluded that defendant was too psychotic to be responsible for his actions. He agreed with the others that the incident related by William Bailey supported his conclusion.

Dr. Albert Stipes, who was also employed by the circuit court of Cook County Psychiatric Institute, testified that he examined defendant five times: March 31, 1987, July 17, 1987, October 30, 1987, March 21, 1988, and April 28, 1988. In forming his opinion, he relied on the same sources as Drs. Prentice, Markos and Rabin, including their reports. He opined that defendant suffered from a schizo-affective disorder at the time of the killings and as a result he lacked the substantial capacity to appreciate the criminality of his acts and conform his conduct to the law. Dr. Stipes concurred that the differences in the diagnoses of defendant were academic as they were "different manifestations of the same illness at different times." He agreed with the others that defendant was not malingering and that the descriptions of defendant's behavior in the police reports and the incident related by William Bailey supported his conclusion.

The trial court found defendant guilty but mentally ill of the murder of his parents and sentenced him to natural life in prison.

OPINION

We will first address defendant's contention that the trial court erred in finding him guilty but mentally ill rather than legally insane. Under section 6—2 of the Criminal Code of 1961, a person is not responsible for his conduct if "at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1989, ch. 38, par. 6—2(a).) The defense of insanity is an affirmative one which defendant has the burden of raising and proving by a preponderance of the evidence. (*People v. West* (1992), 231 Ill. App. 3d 646, 596 N.E.2d 740; *People v. Thurman* (1991), 223 Ill. App. 3d 196, 584 N.E.2d 1069.) The issue of defendant's sanity is one of fact and the trier of fact's determination on that issue will not be reversed unless contrary to the manifest weight of the evidence. *People v. Thurman*, 223 Ill. App. 3d at 201; see also *People v. Wilhoite* (1991), 228 Ill. App. 3d 12, 20, 592 N.E.2d 48 (noting change of standard of review to one of whether the trial court's determination was against the manifest weight of the evidence as the relevant burden of proof was modified from "beyond a reasonable doubt" to "preponderance of the evidence").

In arguing that the trial court's decision is against the manifest weight of the evidence, defendant points to the fact that four expert witnesses testified that defendant was insane at the time of the crime and that no expert witnesses testified on behalf of the State. Defendant further asserts that the opinions of his experts are amply supported by a substantial body of lay testimony from defendant's friends and family members and by the relevant police reports and hospital records. In response, the State argues that the trial court was within its province as fact finder to reject all the expert testimony and rest its finding that the defendant was not insane solely on the lay testimony presented at trial.

The State is correct in its assertion that it need not present expert testimony on the issue of defendant's sanity (*People v. Thurman*, 223 Ill. App. 3d at 201; *People v. Deizman* (1976), 44 Ill. App. 3d 829, 358 N.E.2d 1208) and may instead rely on facts in evidence and the inferences that can be drawn therefrom by the trier of fact. *People v. Camden* (1991), 219 Ill. App. 3d 124, 578 N.E.2d 1211; *People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.

In making its determination, a trier of fact is free to accept the opinion of one expert witness over another (*People v. Moore* (1986), 147 Ill. App. 3d 881, 498 N.E.2d 701) or accept part and reject part of each expert's testimony. (*People v. McCleary* (1990), 208 Ill. App. 3d 466, 567

N.E.2d 434.) The relative weight to be given an expert witness' opinion "is measured by the reasons given for the conclusion and the factual details supporting it." (*People v. Wilhoite*, 228 Ill. App. 3d at 20-21; *People v. Hoots* (1992), 228 Ill. App. 3d 42, 592 N.E.2d 483.) The trier of fact may determine the issue of sanity solely on the basis of the opinion of lay witnesses if such opinions are based on personal observations of the defendant. (*People v. Bouchard* (1989), 180 Ill. App. 3d 26, 535 N.E.2d 1001; see also *People v. Kluxdal* (1991), 225 Ill. App. 3d 217, 586 N.E.2d 701.) Lay opinions on defendant's sanity are particularly relevant if based on observations made shortly before or after the occurrence of the crime. (*People v. Williams* (1990), 201 Ill. App. 3d 207, 219, 558 N.E.2d 1258; *People v. Bouchard*, 180 Ill. App. 3d at 35-36.) Other relevant factors in determining whether defendant was sane at the time of the offense include a plan for the crime and methods to prevent detection. *People v. West*, 231 Ill. App. 3d at 651; *People v. Williams*, 201 Ill. App. 3d at 219.

■■ In this case, the trial court did not give any reason for rejecting the defendant's proffered expert witness testimony, stating that it was relying on the lay testimony. In this respect, "it does not seem that the court questioned the credibility of the psychiatrists, but rather that it drew different conclusions than they did." (*People v. Arndt* (1980), 86 Ill. App. 3d 744, 749, 408 N.E.2d 757.) While a trial court is free to reject expert opinion testimony, we can see no basis for doing so in this case. This is not a case where there is substantial disagreement among the testifying experts (*People v. Williams*, 201 Ill. App. 3d at 216-17); there was substantial testimony that the slight difference between the diagnoses of the four experts was an academic one (schizophrenia and schizo-affective disorder). This is also not a case where the experts' opinions suffer from a failure to consider relevant authorities or information concerning the defendant (*People v. Williams*, 201 Ill. App. 3d at 218) or ignore information which was contrary to their opinion (*People v. Jackson* (1987), 170 Ill. App. 3d 77, 522 N.E.2d 577); each expert testified that he considered all the available information on defendant's condition. Moreover, the credibility of the experts was further bolstered in this case in that three of the experts, Drs. Markos, Rabin, and Stipes, were employed by the circuit court of Cook County's Psychiatric Institute and initially examined defendant pursuant to court order; they were not hired by defendant to examine him and then provide an opinion at trial.

The experts all reviewed the records of defendant's initial hospitalization in December 1985. Those records established that defendant was suffering from schizophrenia approximately six months prior to the kill-

ings and that he was treated with anti-psychotic medication at that time. Many of the psychological problems and symptoms defendant displayed after the killings were also displayed during that earlier hospitalization, including the fact that he did not appreciate that he was ill, that he was withdrawn, that he suffered delusions, and that he was unusually suspicious of others. Moreover, that diagnosis was obtained in the ordinary course of treatment and could not have been procured with the intent of gaining any legal benefit. Thus, defendant's previous mental health history strongly supports the experts' opinions, particularly since the testimony at trial was undisputed that schizophrenia is a chronic illness, even though that illness will not necessarily permeate the entire gamut of a patient's behavior at all times. See *People v. Palmer* (1985), 139 Ill. App. 3d 966, 973, 487 N.E.2d 1154 (appellate court reversed the trial court's finding of guilty but mentally ill, holding that there was a reasonable doubt as to defendant's sanity in light of defendant's history of mental illness including his prior psychiatric hospitalization, his failure to plan or attempt to conceal the crime, the lack of credibility of the State's expert, and the lay testimony which corroborated the defense expert's conclusion that the defendant was insane).

■ The State contends that the experts' opinions are also not credible because the testifying experts did not examine the defendant until months after the incident. We find this argument unpersuasive. In this case, each expert had an abundance of information concerning defendant's behavior and psychological state before, during, and after the crime. Here, all of the testifying experts based their opinions in large part on records of events shortly after the incident. Each of the experts examined the police reports which described defendant's bizarre behavior during that period. Furthermore, each expert considered the content of defendant's statement to the police and all concluded that it supported their opinions. *People v. Horton* (1975), 29 Ill. App. 3d 704, 331 N.E.2d 104 (considering content of defendant's statements in determining issue of sanity).

All of the experts reviewed the hospital records of the defendant's stay in the jail's psychiatric facility four days after the incident which described his treatment. They had the benefit of reviewing the pretrial transcript which included, in substance, all the lay testimony presented by the State which the trial court heard. See *People v. Janecek* (1989), 185 Ill. App. 3d 89, 540 N.E.2d 1139 (Appellate court reversed defendant's conviction for reckless damage and felony criminal damage to property, determining that trial court's finding was against the manifest weight of the evidence. Both State and defense witnesses established that at the time of the incident, defendant was confused, incoherent,

and suffering from delusions and hallucinations and the psychiatrist who examined defendant after the incident determined that defendant could not conform her conduct to the law).

Furthermore, each expert interviewed defendant over an extended period of time; Dr. Stipes interviewed him five times and Drs. Markos and Rabin interviewed him three times each. They all discussed the incident with defendant. Without exception, all of the experts concluded that defendant lacked the substantial capacity to appreciate the criminality of his conduct and could not conform his conduct to the requirements of law as a result of his mental disease or defect at the time of the crime. While it is within the province of the trial court as the judge of the witness' credibility to reject or give little weight to certain testimony, even expert psychiatric testimony, this power is not an unbridled one. *People v. Williams* (1980), 87 Ill. App. 3d 860, 409 N.E.2d 439 (reversing trial court's finding that defendant was fit to stand trial when both of the court appointed psychiatrists testified that defendant was unfit to stand trial).

The case of *People v. Garcia* (1987), 156 Ill. App. 3d 417, 509 N.E.2d 600, is directly in point. There the court held that the trial court's conviction of defendant was against the manifest weight of the evidence where the State offered no expert testimony and two psychiatrists testified for the defense that defendant had been exhibiting psychotic behavior for two years prior to the incident in question and was insane at the time of the incident. The appellate court reversed in spite of evidence establishing a previous quarrel between the victim and the defendant. There was also testimony of an eyewitnesses who stated that defendant was not in a trance at the time of the stabbing and appeared "totally calm" and testimony of the arresting officer who stated that defendant was "totally cooperative" and that his voice sounded normal.

The facts in this case, even more strongly than in *Garcia*, support the conclusion that the trial court's findings were against the manifest weight of the evidence. Here four unimpeached expert witnesses testified for the defense, three of whom were employed by the circuit court of Cook County Psychiatric Institute, having been designated by the trial court to examine defendant. The unimpeached testimony and conclusions of the experts were supported by the evidence of defendant's prior hospitalization for the same disease six months prior to the killings. No experts testified on behalf of the State. In addition, the lay evidence tilting toward the State in this case was far more tenuous than that in *Garcia* and, as shall be more fully discussed below, that evidence was effectively explained by defendant's experts to be fully consistent with and supportive of their opinions.

■ The State argues that defendant's trip to Nebraska after the crime and the lay testimony in the record support a finding that the defendant was sane at the time of the crime. We disagree. While flight from a crime scene can be indicative of an attempt to prevent detection, such flight differs significantly from flight which is part of the defendant's insane delusions or hallucinations. (See *People v. Wilhoite*, 228 Ill. App. 3d at 26 (noting the difference between flight to avoid punishment and flight which is part of defendant's insane delusion in reversing trial court's decision as against the manifest weight of the evidence).) The experts, Dr. Rabin in particular, concluded that defendant left the State because he was in fear of his own life. This conclusion is supported by the undisputed evidence presented at trial as to defendant's paranoia and persistent fear of people pursuing him. Thus, defendant's "flight" to Nebraska is readily assimilable in the diagnoses of the doctors that defendant was fleeing from delusional paranoia pursuit after the killings. See *People v. Wilhoite*, 228 Ill. App. 3d at 26; *People v. Arndt*, 86 Ill. App. 3d at 749-50 (appellate court deferred to the psychiatric testimony explaining defendant's conduct in rejecting the trial court's conclusions drawn from the same facts).

The State further relies on the testimony of Marley and Pienta, who both stated in a somewhat summary fashion that defendant did not appear to be acting in an abnormal fashion when they first saw him two days after the killings. This testimony is belied by their very own testimony that defendant's speech was rapid during his confession and that during his confession he referred to methods of religion and made the apocalyptic statement that the "father dies before the son." The expert witnesses who reviewed these facts were clear and unimpeached in their conclusions that defendant's rapid and pressurized speech and the religious content of his confession were indicative of psychotic behavior even at that time. The testimony of Marley and Pienta is further belied by the reports of defendant's behavior the prior day, at which time he appeared confused, said that people were scratching inside his chest, and asked for a gun to shoot himself. Their testimony is further called into question by defendant's subsequent behavior which necessitated his hospitalization in the prison's psychiatric ward immediately following his extradition (May 12, 1986, through May 14, 1986).

■ Thus, the evidence at trial supporting the conclusion of legal insanity was overwhelming. This evidence included the testimony of the four experts who testified for the defense, whose credibility and qualifications were unimpeached, and defendant's well-documented prior and subsequent psychotic behavior, including his prior and subsequent hospitalizations. This evidence also included the lay testimony of his friends,

family and supervisor (Gauthier), who ostensibly testified for the State, but whose testimony further supports the defense. Compare this with the fact that the State presented no expert testimony, and what lay testimony it presented was internally inconsistent. The conclusions drawn by the lay witnesses presented by the State from the facts they testified to were specifically repudiated by the testimony of the experts in their evaluation of those same facts. Accordingly, we conclude that the trial court's finding that defendant was guilty but mentally ill was against the manifest weight of the evidence. See *People v. Garcia*, 156 Ill. App. 3d 417, 509 N.E.2d 600 (discussed and summarized earlier); in addition see *People v. Wilhoite*, 228 Ill. App. 3d at 27-28 (reversing trial court's finding that defendant was not legally insane as against the manifest weight of the evidence when the testimony of the State's expert witness was weak and unsupported by factual details and defendant offered credible expert testimony which considered sources relied on by the State's expert in addition to other reliable sources not considered by the State's expert); see also *People v. Arndt*, 86 Ill. App. 3d at 749-50 (trial court's determination that defendant was guilty of murder was against the manifest weight of the evidence where the trial court did not appear to question the credibility of the defendant's experts, but merely drew different conclusions than they did).

Aside from the fact that defendant's conviction was against the manifest weight of the evidence, his conviction would still have to be reversed because the confession which served as the linchpin of the State's case was obtained in violation of defendant's fifth amendment right to counsel.

In *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the United States Supreme Court established the bright-line rule that once a defendant asserts his right to have counsel present during police interrogation, all questioning must cease until defendant's counsel is present. There, the defendant requested counsel during an interrogation and the police ceased their questioning, but returned the next day telling defendant they wanted to talk to him. After the officers read defendant his *Miranda* warnings again, defendant agreed to speak with them, but it was not clear what prompted him to do so. The Court held that the defendant's subsequent statement was obtained in violation of his fifth amendment right to counsel in that once defendant asserts his right to counsel, all questioning must cease until counsel is obtained.

The underlying rationale of this rule is well established. By invoking the right to have an attorney present during questioning, the "accused *** has indicated that he considers himself unable to deal with the pres-

sures of custodial interrogation without legal assistance." (*People v. Hicks* (1989), 132 Ill. 2d 488, 494, 548 N.E.2d 1042; *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093.) "In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (*Smith v. Illinois* (1984), 469 U.S. 91, 98, 83 L. Ed. 2d 488, 495-96, 105 S. Ct. 490, 494.) As such, where an "accused has invoked his right to an attorney during police questioning, rather than solely his right to remain silent, his later waiver of the right to counsel upon police-initiated reinterrogation will not be given legal cognizance; instead it will be deemed involuntary as a matter of law." *People v. Warner* (1986), 146 Ill. App. 3d 370, 376, 496 N.E.2d 1010.

The defendant, however, may subsequently waive the right to have counsel present after he has invoked this right by initiating further communications, exchanges or conversations with the police. (*People v. Hicks*, 132 Ill. 2d at 494.) The burden is on the State to demonstrate that the waiver was "knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards v. Arizona*, 451 U.S. at 486 n.9, 68 L. Ed. 2d at 387 n.9, 101 S. Ct. at 1885 n.9; *People v. Maust* (1991), 216 Ill. App. 3d 173, 576 N.E.2d 965.

The determination of whether defendant waived his rights requires a two-part inquiry. First, it must be shown that "defendant initiated the conversation in a manner evincing a 'willingness and a desire for a generalized discussion about the investigation.' " (*People v. Hicks*, 132 Ill. 2d at 493, quoting *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045-46, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2835.) Second, the court must look to see whether, "by defendant's initiation of a conversation, coupled with the totality of the other circumstances, he knowingly and intelligently waived his right to counsel's presence during questioning." *People v. Hicks*, 132 Ill. 2d at 493.

The State contends that defendant's statement was not obtained in violation of his rights because he reinitiated the contact with the police and because there was no "custodial interrogation" present. In this respect, the State argues that the officers entered the room to ask the defendant about his extradition to Illinois and were therefore not attempting to elicit incriminating responses from the defendant. However, in "*Edwards* *** the focus was on the state of mind of the suspect, rather than the police." (*People v. Young* (1992), 153 Ill. 2d 383, 399, 607

N.E.2d 123; see also *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093.) We further note that the officers' intended purpose, to question defendant about his extradition to Illinois, does not escape the scope of the bright-line rule in *Edwards*. (See *Christopher v. State* (11th Cir. 1987), 824 F.2d 836, 845.) There the court explicitly held that because the "officers' inquiries regarding [defendant's] extradition 'relate[d] directly or indirectly to the investigation,' these questions were an unlawful continuation of the interrogation." *Christopher v. State*, 824 F.2d at 845, quoting *United States v. Johnson* (11th Cir. 1986), 812 F.2d 1329, 1331.

The rule of *Edwards* has been consistently reinforced by the United States Supreme Court. In *Minnick v. Mississippi*, (1990), 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486, the defendant asserted his right to speak with counsel during his initial interrogation by FBI agents. The FBI agents then ceased questioning and defendant subsequently spoke with his attorney two or three times. Three days after his initial interrogation, defendant was taken from his cell to speak with a Mississippi police officer concerning the offense in question. Defendant did not request a meeting and said that he did not want to talk to the police. After being taken to an interrogation room and talking with the officers, defendant confessed. The Court reaffirmed the prophylactic nature of *Edwards*, stating:

> "In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with an attorney." (*Minnick v. Mississippi*, 498 U.S. at 153, 112 L. Ed. 2d at 498, 111 S. Ct. at 491.)

Thus, in *Minnick*, the Court held that under the fifth amendment, defendant's invocation of his right to counsel in the presence of the police of one jurisdiction (FBI) precluded the reinitiation of formal questioning by the police of another jurisdiction (Mississippi) even under circumstances where defendant was allowed to speak with an attorney in the interim.

■ As in *Minnick*, it is uncontradicted that defendant was taken from his cell and placed in an interview room at the direction of the police so that two Chicago detectives, who were admittedly informed by the Nebraska authorities that defendant had invoked his fifth amendment right to counsel, could question him. Moreover, in this case, the

Nebraska officer in charge testified that he took no steps to provide defendant with an attorney after defendant requested one and both sides agree that unlike the defendant in *Minnick*, defendant here did not speak to an attorney prior to speaking with the Chicago detectives. The Chicago detectives entered the interview room and identified themselves, knowing and ignoring the fact that defendant had requested an attorney and that one had not been provided for him. It is uncontradicted that defendant did not request or seek an opportunity to speak with these Chicago detectives, or any police officers. The Chicago detectives then read defendant his *Miranda* rights again. In so doing, Detective Pienta asked defendant after each right whether he understood the right in question.

As in *Minnick*, defendant here was required to attend a formal interview with officers in spite of the fact that he had asserted his right to speak with counsel. The officers initiated the questioning with defendant by reading defendant his *Miranda* rights again and then asking him whether he understood his rights. Therefore it was the police, not the defendant, who reestablished and initiated the formal interview. Such reinitiation is inconsistent with the Court's admonition:

> " 'No authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.' " *Smith v. Illinois* (1984), 469 U.S. 91, 99, 83 L. Ed. 2d 488, 496, 105 S. Ct. 490, 495 quoting *People v. Smith* (1984), 102 Ill. 2d 365, 376, 466 N.E.2d 236, 241 (Simon J., dissenting).

*Edwards v. Arizona*, 451 U.S. at 487, 68 L. Ed. 2d at 387-88, 101 S. Ct. at 1886 (it was "clear that without making counsel available to Edwards, the police returned to him the next day. This was not at his suggestion or request").

Consequently, we conclude that the police improperly reinitiated contact with defendant after he had invoked his fifth amendment right to counsel. (See *Minnick v. Mississippi*, 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486; *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 374, 101 S. Ct. 1880; see also *Smith v. Illinois*, 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.) In arriving at this decision, we note that this is not a case where the defendant invoked his right to counsel to one body of law enforcement officials and then was subsequently given his *Miranda* rights again and questioned again by another branch or body of law enforcement officers who had no knowledge that defendant had invoked his fifth amendment right to counsel. (See, *e.g., People v. Young*

(1992), 153 Ill. 2d 383, 607 N.E.2d 123; *People v. Warner*, 146 Ill. App. 3d 370, 496 N.E.2d 1010.) In those cases, the question before the court is whether the knowledge that defendant has asserted his fifth amendment right to counsel during interrogation by one law enforcement body should be imputed to a second body of law enforcement officers even though they have no knowledge of defendant's assertion of his rights. There is no question in this case that the Chicago officers were informed that defendant had invoked his rights and thus these cases offer the State no support. See *Minnick*, 498 U.S. at 152-54, 112 L. Ed. 2d at 497-98, 111 S. Ct. at 490-91.

Based on the clear violation of defendant's fifth amendment right to counsel under *Edwards* and its progeny, we need not determine whether defendant's mental illness precludes his confession from being voluntary (*Colorado v. Connelly* (1986), 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515), or whether his mental illness prevents any waiver from being a "knowing and intelligent" one. See *Miller v. Dugger* (11th Cir. 1988), 838 F.2d 1530.

Even if we did not hold that the trial court's conviction was against the manifest weight of the evidence, we would determine that the State could not present sufficient evidence to convict defendant absent such confession and would thus reverse defendant's conviction for this reason as well. See *People v. Olivera* (1993), 246 Ill. App. 3d 921.

For the foregoing reasons, the judgment of the circuit court is reversed and the cause is remanded with directions that the court enter a finding of not guilty by reason of insanity and for further proceedings pursuant to section 5—2—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—2—4), which controls such dispositions.

Judgment reversed and remanded with directions.

McNULTY AND COUSINS,* JJ., concur.

---

*Justice Lorenz originally sat on the panel in this appeal. Upon Justice Lorenz's retirement, Justice Cousins substituted in the decision of this appeal. He has read the briefs and listened to the tape of oral argument.